UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DRAKILE LEROY JONES,

      Petitioner,

v.

JEFFREY HOWARD,[1]

      Respondent.

Case No. 22-cv-11824

Honorable Robert J. White

---

**OPINION AND ORDER
GRANTING CONDITIONAL WRIT OF HABEAS CORPUS**

---

I.    <u>Introduction</u>

Petitioner Drakile Leroy Jones has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254, through counsel, challenging his convictions for first-degree felony murder, Mich. Comp. Laws § 750.316, armed robbery, Mich. Comp. Laws § 750.529, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. (ECF Nos. 1, 2.)

This case explores the boundary between trial strategy and ineffective assistance of counsel. Defense counsel are afforded great deference in how they

---

[1] The proper respondent in a habeas case is the custodian of the facility where the petitioner is incarcerated. *See* Rule 2(a), Rules Governing Section 2254 Cases. Thus, the Court substitutes Jeffrey Howard, the warden at the facility where Petitioner is presently incarcerated, as the Respondent.

choose to defend a case.  The defense attorney, with consultation of his client, is in the best position to decide which witnesses to call and which to forego; which theories to advance and which to abandon; the decisions are numerous and complex. These decisions form the basis of the definition of the term "trial strategy."  On the other hand, whatever the broad discretion afforded counsel in furtherance of "trial strategy" encompasses, it cannot be premised upon mistakes of law and the failure to investigate or prepare.  A claim of "trial strategy" does not cure an injustice where the ineffective assistance is so severe and pervasive that it undermines confidence in the ultimate result.

The state court record in this case demonstrates that Jones's trial counsel (1) misrepresented to the state trial court that the government had not disclosed critical information to him (they did), (2) failed to conduct even a cursory review of those critical materials, (3) proceeded with the trial after recognizing his error without even requesting an adjournment or opportunity to review those materials, (4) then, predictably, failed to attempt to impeach the primary government witness with exculpatory information he didn't know he had, with (5) rules of evidence he did not understand how to use.  Jones didn't just deserve better – justice requires more. Accordingly, the Court grants Jones a conditional writ of habeas corpus.

II.     <u>Background</u>

On January 27, 2016, Phillip Pentecost was shot and killed in his driveway on Minock Street in Detroit.  He was pronounced dead at the scene from two gunshot wounds -- one to the head, one to the abdomen.  The two bullets were fired from the same gun and determined to be from the 38 class of bullets.[2]

Justin Harris, Pentecost's neighbor, called 911. He was found holding a shirt to Harris's head when police arrived.  Detroit police officer Christine Winans, one of the first responding officers, noticed that a cellphone was on Pentecost's chest. She saw Harris place the phone in his pocket and start to walk away.  Another officer asked Harris if that was his phone.  Harris said it was not and surrendered the phone to the officer.  Police later determined the phone belonged to Robert Carter.

Police arrested Carter on February 3, 2016.   In total, Carter gave four statements to police.  The statements remained consistent on just a few points: Jones and Carter went to Justin Harris's house on Minock Street on the night of the shooting.  At some point, someone shot Pentecost and drove away with his car. Carter's statements with respect to key elements - the shooter's identity and the extent of Carter's, Jones's, and Harris's involvement in the crimes - changed with each statement.

---

[2] The 38 class of bullets includes .38 caliber, .380-, .357- and 9-millimeter.  (ECF No. 7-16, PageID.1764.)

3

First Statement: In his first statement, on February 3, 2016, 7:02 p.m., Carter placed all the blame on a man he claimed not to know[3] and maintained that he and Jones were innocent bystanders.  Carter told police that he and Jones were riding in Jones's mother's van when Jones stopped at a home on Minock Street.  Three men were inside the home.  Jones and Carter stayed for only about five minutes.  One of the three men (Harris) walked Carter and Jones out onto the porch.  The man looked down the street and said, "[T]here goes the dude that owes me some money.  I should go down there and see if he has my money."  (ECF No. 2-1, PageID.82.)

The man walked down to the car, returned to the porch and said the other man was asleep in the car.  He said, "I should go and get my cheese," then went into the house and came out with a ski mask which he wore as a skullcap.  (*Id.* at PageID.83.) The man walked down to the car, a Chevrolet HHR.  Jones and Carter trailed behind but did not get close to the car.  The man opened the door, pulled out the driver, and held a gun to the driver's head.  The man reached into the driver's pants pockets. Then the gun went off.  Jones and Carter ran back to the van and drove off.  Carter saw the HHR pulling out of the driveway as he and Jones were leaving.  Carter also stated that the shooter later called Jones "and told him not to call him anymore."  (*Id.* at PageID.86.)

---

[3] Carter did not identify this man by name in this statement.  But, in his fourth statement, Carter identified Justin Harris as the individual whose house he and Jones visited and to whom Pentecost owed money.

4

Importantly, the jury never heard the evidence that Carter exonerated Jones in his first statement.

Second Statement:  Approximately three hours later, Carter gave a second statement.  In this statement, he continued to maintain that he and Jones were not responsible for the shooting or the car theft but acknowledged more involvement than originally stated.  Carter admitted that when Harris went into his house to get a ski mask, the man also retrieved a revolver.  All three men walked to the HHR and, when Harris pulled the driver out of the car, Carter went through the man's pockets. Carter and Jones then rifled through the contents of the HHR and Carter took a brown leather jacket.[4]  Carter then heard a gunshot.  He and Jones ran to the van and drove away.  Carter looked back and saw the HHR being driven down the street behind them.

This is the second exculpatory statement, but again, the jury never heard it.

Third Statement: Approximately ninety minutes later, Carter gave a third statement.  In this version, Jones was the shooter.  Carter stated that as the three men walked to the HHR, the unknown man gave Jones the gun.  After the driver was pulled out of the car, Carter checked his pockets.  Jones then shot the driver.  Carter

---

[4] This leather jacket was found in Carter's home when police executed a search warrant.

began running to the van and then heard a second gunshot.  He saw Harris jump into the HHR and drive away.

Jail calls between Carter and Williams: After Carter's third statement but before his fourth and final statement, Carter made a series of seven phone calls to Taevion Williams over a period of approximately thirty days – from February 9, 2016 to March 6, 2016.  The jail calls were recorded and produced to the defense during pretrial discovery.  Defense counsel suspected that Carter and Williams had collaborated to create a narrative which would exonerate Carter and implicate Jones. He believed that Carter and Williams may have concocted this story during jail phone calls, but claimed he did not know for certain because the prosecution did not produce any jail calls or jail logs.  (ECF No. 7-14, PageID.1575.)  Counsel stated it had been brought to his attention that calls between Williams and Carter occurred, but he would "never be able to verify that.  I just have to take this witness' word for it, that perhaps they orchestrated this." (*Id.*)  In fact, the prosecution provided defense counsel with a disk containing the recorded conversations prior to trial. (*Id.* at 1576.)  On the third day of a four-day trial, counsel admitted that he had not listened to the recordings.

The calls show that Carter and Williams collaborated to craft testimony to exonerate themselves and inculpate Jones.  The calls also impeach Williams's trial testimony and Carter's hearsay statements on several points, *e.g.*, Carter identified

6

Harris as the shooter, Williams admitted to getting rid of the murder weapon at Carter's direction.  But the jury never heard the calls nor, remarkably, did defense counsel.  Counsel did not listen to the calls before trial commenced because he did not know the government had produced a recording of the calls during discovery.

Once counsel learned he had the recordings, he did not ask for an adjournment to listen to the calls.  Instead, counsel proceeded to cross-examine Williams.  He tried to impeach Williams and Carter, but without Carter's prior statements and without listening to the recordings, counsel entered this contest unarmed.  At the conclusion of Williams's testimony, counsel said, "I may need to recall him after I listen to the jail calls." (*Id.* at PageID. 1621.)  He did not recall Williams and there is no indication that counsel listened to the recording at any point before the next day when the defense rested without calling any witnesses.

Fourth Statement:  Over three months later, on May 24, 2016, Carter made a fourth statement.  This time, he placed the blame for the shooting and theft solely on Jones.  For the first time, Carter maintained that he participated in the robbery only after Jones threatened him with a gun if he refused to do so.  Also, for the first time, Carter completely exonerated Harris.  He claimed that after Harris walked Carter and Jones to the front porch, Harris went back inside his home and did not participate in the robbery or murder.  Carter claimed that he twice asked Jones to let Pentecost go after Jones pulled him out of the HHR.  Instead, Jones shot Pentecost in the

abdomen.  After the man fell, Jones shot him in the back of the head.  Jones ordered Carter to get in the HHR and follow him.  They drove to Jones's home where Jones handed Carter the gun and told him to get rid of both the car and the gun.

Carter drove to his friend Taevion Williams's house where he wiped down the car.  He stayed at Williams's house that evening.  Carter gave the gun to Williams who sold the gun and shared the proceeds with Carter.  The next day, Jones drove to Williams's house with his cousin "Booman."  Carter drove the car to 8 Mile Road near I-75 and burned the car.  Jones then drove Carter back home.

Carter's fourth statement led police to question Taevion Williams.  On June 6, 2016, after months of calls between Carter and Williams discussing his testimony, Williams gave a statement to police which essentially mirrored Carter's fourth statement.  Carter did not testify at Jones's trial, but Taevion Williams did.  Defense counsel moved to exclude Williams's testimony on confrontation and hearsay grounds.  The trial court overruled counsel's objections.

On the witness stand, Williams testified that Carter called him during the early morning hours of January 27, 2016.  Carter sounded scared and asked if he could come to Williams's house.  Williams agreed. Carter arrived in a black Chevrolet HHR and told Williams he needed to put the car somewhere.  Williams told him to drive it around the corner.  They drove the car behind a store that was about two blocks away.  The men returned to Williams's home and went to sleep.  The next

morning, Carter told Williams he had participated in a robbery with Jones, and someone had been shot.  Williams testified that Carter said he and Jones were looking for someone to rob.  When they found someone, Carter had a change of heart and did not want to proceed.  Jones told Carter that if Carter did not participate "he would turn the gun against him."  (ECF No. 7-14, PageID.1593.)  Later that evening, Carter asked Williams to help him burn the Chevy.  Williams refused. Williams denied that Carter asked him to get rid of a gun.

During cross-examination, counsel briefly asked Williams about phone calls he had with Carter while Carter was jailed and awaiting trial.  The recorded calls, although available to defense counsel, were not played for the jury.  The jail calls play prominently in Jones's ineffective assistance of counsel claim and will be discussed in much greater detail below.

Justin Harris also testified at trial.  Harris testified that he lived next door to Phil Pentecost on Minock Street.  He would see Pentecost a few times a week and they were friendly.  On the evening of January 26, 2016, Harris ran into Jones, who had been a "neighborhood friend", and the two discussed music because Harris is a music producer.  Jones indicated interest in buying some equipment from Harris.

Back at home, Harris's cousin Anthony Cox-Rodgers and his friend Ryan Shaw were with him.  When the three men returned from getting food, they saw Pentecost's car, a Chevrolet HHR, parked in Pentecost's driveway.  The car was

running and the headlights were on.  Harris could not see if anyone was in the car because the tinted windows were rolled up, but it was not particularly unusual for Pentecost to sit in his car outside the home.

Once back in the house, Harris received a call from Jones.  He and Jones talked about music for a while.  Jones asked Harris if he had "a burner," which Harris understood to mean a gun. (ECF No. 7-12, PageID.1211.)  Harris said he did not. Jones asked about hitting licks, which Harris understood to mean "[a] way of coming up with some money," including by robbing someone. (*Id.*)  Harris invited Jones to come to his house, but then became hesitant when Jones said he was with a friend. Jones assured Harris of his friend's loyalty by stating that if Jones told his friend to shoot someone the friend would do so.  Jones and Carter (who Harris testified he did not know) came to Harris's house.  Jones asked Harris a couple of times where the licks were.  Harris did not know so eventually the conversation moved to music.

Harris could tell that Jones did not have a gun that night, but he could see the butt of a gun sticking out of Carter's front hoodie pocket. When Carter and Jones were ready to leave, Harris walked them outside.  He saw them get into a van and then went back inside the house.  About ten to fifteen minutes later, Harris looked out the window and saw that the van had not pulled away yet.  It looked like the men were in the van.  Harris stepped away from the window.  Moments later, he heard two gunshots.  He looked out the window then and saw a van driving down the street

10

followed by Pentecost's car.  He believed it was Jones's van because the van was no longer in the driveway.

Harris went outside and saw Pentecost lying on the ground, with a gunshot wound to his head.  Harris called 911.  He picked up a phone that had been lying by Pentecost, thinking it was Pentecost's phone.  He talked to police that night but did not mention anything about Jones or Carter because he did not know if they were involved.  He also did not want to be a witness.

After the police left, Harris received a call from Jones.  Jones said, "You haven't heard anything.  You haven't seen anything.  You haven't talked to me." (ECF No. 7-12, PageID.1226)

Harris gave two statements to police.  In the first statement given on the night of the shooting, Harris did not mention Jones or Carter.  He also did not mention to police that moments before the shooting he had seen Carter with a gun in his pocket. About eight days after the shooting, police showed Harris a picture and he recognized Jones. He also viewed a lineup and picked Carter out as Jones's friend. This was the first time that Harris said anything to police about Carter and Jones.

James R. Williams, Jr., testified that Carter is his nephew and lived with him at the time of the shooting.  At some point prior to Jones's trial, Williams, Jr., realized that two guns he owned and kept in a closet had been stolen.  He filed a

police report but did not know who had taken them.  The guns, a Colt .38 revolver and a Smith & Wesson 9 mm, were never recovered.

On the evening of January 28, 2016, Lieutenant Joseph Crandall, an investigator with the Detroit Fire Department, responded to a report of a car fire in the backyard of an abandoned house on Detroit's east side.  He determined that the fire had been intentionally set.  Keith Dawson, an employee with the Detroit Police Auto Theft Unit, identified the burned car as a Chevy HHR.  Despite severe damage to the car, Dawson was able to obtain a VIN number.  Police determined that the car was registered to Phillip Pentecost's mother and had been reported stolen on January 27, 2016.  The record does not indicate whether police investigated who reported the car as stolen.

III.   Procedural History

Jones was convicted following a jury trial in Wayne County Circuit Court. He was sentenced to life without parole for felony murder, 25 to 50 years for armed robbery, and 2 years for felony firearm.

Jones seeks a writ of habeas corpus on the following claims:

I.  Trial counsel failed to investigate and present crucial impeachment evidence, undermining confidence in the outcome.  Counsel's failure denied Mr. Jones his Sixth Amendment right to counsel and he is entitled to habeas corpus relief.

II.  No fairminded jurist could agree that Carter's hearsay statement was nontestimonial.  Its admission violated Mr. Jones' Sixth Amendment right to confrontation.

12

III.  Allowing the jury to hear Carter's hearsay statements denied Jones
a fair trial.

(ECF No. 2, PageID.17.)

Respondent filed an answer in opposition arguing that: (1) the petition was

not timely filed; (2) claim III is unexhausted; and (3) claims I and III are procedurally

defaulted.  (ECF No. 6.)  Jones filed a reply brief.  (ECF No. 10.)

The Court heard oral argument on May 8, 2025.  During the hearing, the

parties made several concessions that the Court finds helpful, as they narrow the

issues and facilitate a more focused review of Jones's petition. First, Respondent

conceded that the petition was filed within the one-year statute of limitations and

accordingly withdrew the argument that the petition is untimely. Second, counsel for

Jones expressly abandoned Claim III.  Third, as discussed more fully below, Jones

effectively abandoned Claim II by acknowledging the absence of clearly established

Supreme Court precedent.

The parties filed simultaneous supplemental briefs.  (ECF Nos. 20-22.)

IV.  <u>Legal Standards</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this

case, "circumscribe[d]" the standard of review federal courts must apply when

considering an application for a writ of habeas corpus raising constitutional claims,

including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). For

14

claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

V.    Analysis

    A.    Procedural Default

In his first claim, Jones argues that defense counsel was ineffective because counsel failed to present critical impeachment evidence – Carter's prior inconsistent statements and the jail calls between Carter and Williams.   Jones claims that counsel's errors resulted from a fundamental misunderstanding of the law and a failure to investigate and review the evidence.

Respondent argues that Jones procedurally defaulted his ineffective assistance of trial counsel claim.   The doctrine of procedural default applies when (1) a petitioner fails to comply with a state procedural rule, (2) the rule is actually relied upon by the state courts, and (3) the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006).  To determine whether a court relied on a state-law procedural default, the Court may look through unexplained orders to the "last reasoned opinion." *Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991).

Jones's claims of ineffective assistance of counsel rely on two different sources of impeachment, each requiring a separate procedural default analysis. The Court will address each source individually.

1.  Jail Calls

Respondent maintains that Jones's jail-calls-related ineffective assistance of counsel claim is procedurally defaulted because it is unexhausted, and Jones no longer has any means to exhaust this claim in state court.

A state prisoner must exhaust available remedies in state court before raising a claim in a federal petition for a writ of habeas corpus. *See* 28 U.S.C. §§ 2254(b), 2254(c).  To satisfy the exhaustion requirement, all claims must be fairly presented to the state courts through "one full round" of the state's review process. *O'Sullivan v. Boerckel* 526 U.S. 838, 842 (1999).  A petitioner fairly presents a claim to the state courts by raising the "same claim under the same theory" before raising it in a federal habeas petition.  *See Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004).

Jones raised his jail calls claim for the first time in his application for leave to appeal the trial court's denial of his motion for relief from judgment.  A claim is not exhausted when it is raised for the first time "in a procedural context in which its merits will not be considered unless there are special and important reasons therefor." *Castille v. Peoples*, 489 U.S. 346, 351 (1989). To exhaust his jail calls claim, Jones needed to raise this claim in his motion for relief from judgment *and* in the Michigan Court of Appeals and Michigan Supreme Court.  *Blackshere v. Maclaren*, No. 15-1904, 2016 WL 561521, at *4 (6th Cir. Feb. 9, 2016) (affirming district court's holding that claim was unexhausted when petitioner did not raise

16

ineffective-assistance-of-counsel claim until his motion for leave to appeal the denial of his motion for relief from judgment).  Because Jones did not do so, this claim is unexhausted.

Jones no longer has an available state court remedy to exhaust this claim. Michigan law permits only one post-conviction motion for relief from judgment, with limited exceptions.  *See* Mich. Ct. R. 6.502(G)(1).  The limited exceptions— for a retroactive change in law, new evidence discovered after the filing of the first motion, or a court order vacating the defendant's convictions—are inapplicable to Jones's case.  *See* Mich. Ct. R. 6.502(G)(2).  If a federal habeas petitioner has failed to exhaust claims in state court and state law no longer allows him to raise his claims, the claim is procedurally defaulted.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)); *see also Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) ("While in such situations the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, ... the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal review.") (citations omitted).  Because Jones no longer has an avenue for exhausting the jail calls claim in state court, this claim is procedurally defaulted.  *Id.*

## 2. Carter's Prior Inconsistent Statements

Respondent argues that the ineffective assistance of counsel claim based on Carter's prior inconsistent statements is procedurally defaulted because the last state court to issue a reasoned opinion addressing this claim, the Michigan trial court, denied relief under Mich. Ct. R. 6.508(D)(3). (*See* ECF No. 23-12.) This state procedural rule bars post-conviction relief on claims that "could have been raised on appeal from the conviction and sentence" unless the movant can show cause and prejudice. Mich. Ct. R. 6.508(D)(3). Enforcement of Rule 6.508(D)(3) is an independent and adequate state ground sufficient to invoke the procedural default bar. *Amos v. Renico*, 683 F.3d 720, 733 (6th Cir. 2012).

Jones initially conceded that his claim is procedurally defaulted. (*See* ECF No. 2, PageID.36.) But in his reply brief, Jones argues that the trial court's ruling based on the merits, not on an "adequate and independent" state procedural rule. He bases this argument on the Sixth Circuit's decision in *Hewitt-El v. Burgess*, 53 F.4th 969 (2022).

In *Hewitt-El*, the Sixth Circuit Court of Appeals considered whether the petitioner procedurally defaulted his claim that counsel was ineffective for failing to present alibi witnesses, and for introducing evidence of the petitioner's prior convictions. The Sixth Circuit held that the alibi-witnesses claim was not defaulted because the state court did not rely on an "adequate and independent" state

18

procedural rule.  *Id.* at 978.  The Court explained, "A state court's denial of relief on a claim is 'independent' ... if the decision rests on a state-law ground that is 'independent of the merits of the federal claim.'"  *Id.* (quoting *Harris v. Reed*, 489 U.S. 255, 260 (1989)).  The Michigan Court of Appeals denied relief on the ground that defense counsel's "failure to call alibi witnesses was not objectively unreasonable." *Id.* (quotation omitted).  That is, the state court applied the *Strickland* standard for deficient performance and rested its decision on the claim's merits.  *Id.* The Sixth Circuit concluded, therefore, that the state court's ground for denying relief was "not 'independent' of the merits of the federal claim ... To the contrary, it was wholly dependent upon them, which means that the state court did not deny relief on an 'independent' state ground.  Hence the claim was not defaulted for purposes of habeas review." *Id.* (quotation omitted).

In contrast, the Sixth Circuit held that the petitioner's prior-conviction claim was "arguably defaulted" because the Michigan Court of Appeals "denied relief on the ground that [the petitioner] had not shown 'actual prejudice' as defined by Michigan Court Rule 6.508(D)(3)(b)." *Id.*  The Sixth Circuit declined to definitively decide whether the claim was defaulted (rather than just "arguably" so) because any deficiency as to this claim was excused by appellate counsel's ineffectiveness.  *Id.* at 978-79.

19

The trial court's decision in this case is closer to the prior-conviction analysis in *Hewitt-El* than to the alibi-witness analysis. Here, the trial court specifically held that Jones's failure to raise this claim on direct appeal meant that, under Mich. Ct. Rule 6.508(D)(3)(b), relief could be granted only if he demonstrated "'good cause' for failure to raise the grounds on appeal and actual prejudice resulting from the alleged irregularities." (ECF No. 7-22, PageID.2014.) The court held that Jones failed to show good cause or prejudice and therefore denied the motion for relief from judgment. (*Id.* at 2018.) Jones correctly points out that the trial court also denied his ineffective assistance of counsel claim because he failed to show counsel performed deficiently. But a state court does not fail to invoke a procedural default by ruling on the merits in the alternative. *Rogers v. Skipper*, 821 F. App'x 500, 503 (6th Cir. 2020) (citing *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991)).

Jones's reliance on two unpublished Sixth Circuit opinions does not persuade the Court to reach a different result as both are distinguishable. In *Thomas v. Burt*, No. 22-1802, 2023 WL 5447379 (6th Cir. Aug. 24, 2023), the Sixth Circuit reversed a district court's application of procedural default because the state court did not clearly and expressly invoke a procedural bar. The Sixth Circuit held that, although the state court referenced Rule 6.508(D)(3) at the opinion's outset and conclusion, the state court addressed only the merits of the defendant's claims and "never stated

that he failed to raise the claims on direct appeal, let alone held that they were precluded for that reason." *Id.* at *6.

Similarly, in *Dantzler v. Rewerts*, No. 20-1059, 2021 WL 3754248 (6th Cir. Aug. 25, 2021), the Sixth Circuit declined to apply procedural default where the state court referenced Rule 6.508(D)(3) and the cause and prejudice standard, but the court's analysis addressed only the merits of the claims without mentioning that the defendant had failed to raise the claims on direct review. *Id.* at *8.

In contrast, the trial court's opinion denying Jones's motion for relief from judgment specifically referenced Rule 6.508(D)(3), found that Jones failed to raise his claims on direct review, and concluded that Jones failed to establish good cause for failing to raise the claims on direct review or resulting prejudice. (*See* ECF No. 7-22, PageID.2013-08.)

For these reasons, the Court will treat the claim as "arguably" procedurally defaulted because any default is excused by appellate counsel's ineffectiveness. *Hewitt-El*, 53 F.4th at 978.

### B. Cause and Prejudice

The Court has concluded that both pieces of Jones's ineffective assistance of counsel claims are procedurally defaulted. Therefore, the Court may consider the merits of these claims only if Jones establishes either (1) cause for the default and prejudice from the alleged constitutional violation, or (2) that failure to consider the

21

claims would result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### 1. Jail Calls

For the jail calls claim, Jones asserts that he can show an "objective factor external to the defense impeded" his ability to comply with the State's procedural rule. *Murray v. Carter*, 477 U.S. 478, 488 (1986). He argues that the basis for this claim was "not reasonably available" to him until the trial count appointed counsel *after* the court denied his motion for relief from judgment. The calls were transcribed for the first time by appointed counsel and submitted with Jones's application for leave to appeal the trial court's denial of his motion for relief from judgment. It appears that the transcripts of the calls were not available to Jones at the time he filed his motion for relief from judgment and, Jones argues, he could not listen to the calls because he was incarcerated.

Jones's argument fails for two reasons. First, he presumes he could not have obtained the recordings but offers no evidence that he attempted to do so or to ascertain the calls' content.

Second, while Jones may not have had the recordings, he knew they existed. The recordings were discussed when counsel moved to exclude Carter's out-of-court statements. That discussion made it clear that defense counsel had not listened to the recordings and, in fact, did not know he had them even though counsel suspected

22

that Carter and Williams conspired to implicate Jones in the murder. This knowledge was sufficient for Jones to raise a failure to prepare/investigate claim in his motion for relief from judgment without regard to whether he knew the content of the calls. *See Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (holding that pro se status, ignorance of the law, lack of access to trial transcripts, and limited access to law library are insufficient to establish cause to excuse a default). Jones, therefore, fails to establish cause to excuse his default. Because Jones has not established cause, the Court need not reach the prejudice issue. *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 389 (6th Cir. 2004) (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)).

The only remaining option for defeating procedural default is to show that failure to consider this claim will result in "a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Establishing a fundamental miscarriage of justice requires a showing of actual innocence. *See Dretke v. Haley*, 541 U.S. 386, 393 (2004). Jones does not argue that a fundamental miscarriage of justice will result from failure to review this claim.

Therefore, Jones may not rely on the jail calls to assert a separate ineffective assistance of counsel claim. However, as explained below, the Court may consider the jail calls when conducting a *de novo* review of the prejudice prong of Jones's other ineffective assistance claim.

23

2.  Carter's Prior Inconsistent Statements

Jones asserts that his appellate counsel's ineffectiveness establishes cause to excuse the default of his claim that counsel was ineffective for failing to use Carter's prior inconsistent statements.  Appellate counsel's failure to raise a claim on direct appeal may serve as cause to excuse a procedural default if the failure rises to the level of ineffective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).  To establish ineffective assistance of counsel, a petitioner must show that his attorney performed deficiently, and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney is deficient if the attorney's representation "fell below and objective standard of reasonableness," as defined by "prevailing professional norms."  *Id.* at 688.  A petitioner is prejudiced by his attorney's errors if there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A court must apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

In the context of an ineffective assistance of appellate counsel claim, "the petitioner must demonstrate that the issue omitted by counsel was clearly stronger than issues that counsel did present ... and a reasonable probability that he would

have prevailed but for counsel's failure to raise the issue." *Dennis v. Burgess*, 131 F.4th 537, 540 (6th Cir. 2025) (quotations omitted).

When ineffective assistance of appellate counsel is asserted as cause to excuse a procedural default, the ineffective assistance claim is reviewed *de novo*. *Chase v. MaCauley*, 971 F.3d 582, 591-92 (6th Cir. 2020). Whether Jones "can present his ineffective-assistance-of-trial-counsel claim to this court on the merits depends entirely on whether or not that very ineffective-assistance-of-trial-counsel claim has any merit." *Kelly v. Lazaroff*, 846 F.3d 819, 829 (6th Cir. 2017). *See also Wallace v. United States*, 43 F.4th 595, 603 (6th Cir. 2022) (holding that when ineffective assistance of appellate counsel is advanced as cause to excuse a procedural default, the court "must oddly consider the validity of [the defaulted] claim—the very claim that he procedurally defaulted—to decide whether his appellate counsel provided ineffective assistance (and whether we may consider this claim despite that default)."). Therefore, the Court will first consider the strength of Jones's ineffective assistance of trial counsel claim and, based on that assessment, will then determine whether appellate counsel's failure to raise the claim constituted ineffective assistance.

C.  Ineffective Assistance of Trial Counsel

      1. *Strickland v. Washington*

An ineffective assistance of counsel claim has two components. *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.* at 687. To establish deficient representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

      2. Carter's Four Custodial Statements

The Michigan trial court issued the last reasoned decision addressing Jones's claim that counsel was ineffective for failing to use Carter's prior inconsistent statements as impeachment evidence. The trial court held:

> Defendant argues ineffective assistance of trial counsel on account of counsel's failure to use his co-defendant's prior inconsistent statements under MRE 806 to impeach hearsay evidence. However, this Court finds that ineffective assistance of counsel can take the form of a failure to call witnesses or present other evidence only if the failure deprives the defendant of a substantial defense. *People v. Hoyt*, 185 Mich App 531, 537–538; 462 NW2d 793 (1990); *People v. Julian*, 171 Mich App 153, 158–159; 429 NW2d 615 (1988). A defense is substantial if it might have made a difference in the outcome of the trial. *People v. Kelly*, 186 Mich App 524, 526 (1990). Decisions concerning which witness to call, what evidence to present, or the questioning of witnesses are considered part of trial strategy. *Julian*, supra.  In order to overcome the

26

presumption of sound trial strategy, the defendant must show that counsel's failure to prepare for trial resulted in counsel's ignorance of, and hence failure to present valuable evidence that would have substantially benefitted the defendant. *People v. Caballero*, 184 Mich. App. 636, 640–642; 459 N.W.2d 80 (1990). The rule that a defendant is entitled to effective assistance of counsel does not mean that the defendant is entitled to the effective assistance of counsel to the degree that he is assured of a successful defense and acquittal. *People v. Bohn*, 499 Mich. App 244, 260–261; 212 NW2d 61 (1973).

Inasmuch as this Court considers defense counsel's decision to forego using the co-defendant's statements a trial strategy, Defendant's argument is without merit.

(ECF No. 7-22, PageID.2015.)

As discussed, while the Court has concluded that the trial court procedurally defaulted this claim under Michigan Court Rule 6.508(D)(3), the trial court also denied this claim on the merits.  In doing so, the trial court relied only on *Strickland*'s performance prong.  The trial court did not address *Strickland*'s prejudice prong.  Thus, AEDPA's deferential standard of review applies only to the trial court's adjudication of the performance prong. *See Moritz v. Lafler*, 525 F. App'x 277, 284 (6th Cir. 2013) ("[A]s long as the state court put forward a merits-based ground for denying post-conviction relief, its mentioning of procedural default as an alternative or even primary ground for denying relief does not preclude AEDPA deference."). But, as conceded by Respondent,[5] the Court reviews the unadjudicated prejudice prong *de novo*: Where the state court "relied only on one *Strickland* prong to

---

[5] ECF No. 20, PageID.3967, n.3

adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to review of the *Strickland* prong not relied upon by the state court.  The unadjudicated prong is reviewed *de novo*." *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012) (citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

### a.  Performance Prong

As set forth earlier, Carter gave four statements to police.  The first three were given over the course of six hours on the date Carter was arrested.  The fourth statement occurred over three months later, just three weeks before trial.  Carter did not testify at trial.  Instead, his version of what happened the night Pentecost was killed was relayed to the jury through the testimony of his friend Taevion Williams.  Williams's testimony about what Carter told him was essentially the same as Carter's fourth police statement except, conveniently, Williams did not admit to selling the murder weapon.

Defense counsel moved to exclude Williams's testimony on hearsay and Confrontation Clause grounds.  Defense counsel argued that Carter's hearsay statements were unreliable and, because Carter would not testify, defense counsel had no way to impeach his out-of-court statements.  The trial court overruled defense counsel's objections and held that the statements were admissible as statements against Carter's penal interest.  Once the trial court ruled Williams's testimony

admissible, defense counsel could have impeached both Carter and Williams with

Carter's prior inconsistent statements.  Defense counsel did not do so.  This failure

resulted from a misunderstanding of the law.

Defense counsel noted that with each statement Carter provided progressively

more detail about the murder and, simultaneously, minimized his own participation

until, finally, Carter maintained he only participated when forced to do so at

gunpoint.  Counsel argued:

> ... Mr. Carter gave not one, not two, not three, but four previous or
> subsequent confessions, and each one details more and minimizes
> more.
>
> Each time Mr. Carter ... makes a statement, the facts change ...
> [N]obody was involved at first except some third person.
>
> Then suddenly [Jones] is involved a little bit more, and then comes the
> third statement, [Jones] and this other guy did it, and Mr. Carter stood
> by.  Then the fourth statement [Jones] forced Mr. Carter to be involved.
>
> Well, how come I don't get to ask any of those questions?  How come
> I don't get to impeach the character of Mr. Carter? ... *I'll never be able
> to impeach Mr. Carter on this issue not ever.*  None.

(ECF No. 7-14, PageID.1573-74.) (emphasis supplied).

Counsel was mistaken.  Michigan Rule of Evidence 806 allows impeachment

of hearsay declarants:

> When a hearsay statement … has been admitted in evidence, the
> declarant's credibility may be attacked, and then supported, by any
> evidence that would be admissible for those purposes if declarant had
> testified as a witness. The court may admit evidence of the declarant's

inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it.

Mich. R. Evid. 806.

The trial court, the last state court to issue a reasoned opinion addressing this claim, held: "Inasmuch as this Court considers defense counsel's decision to forego using the co-defendant's statements a trial strategy, Defendant's argument is without merit." (ECF No. 7-22, PageID.2015.)  The trial court failed to address counsel's apparent lack of awareness that, under Michigan Rule of Evidence 806, he was permitted to impeach Carter *through* Williams.

It is clearly established Supreme Court precedent that decisions based on mistaken beliefs regarding the evidence and/or law cannot be said to be sound trial strategy.  In *Kimmelman v. Morrison*, 477 U.S. 365, 383-87 (1986), the Supreme Court held that an attorney performed deficiently by failing to learn the state rules governing pretrial discovery.  Defense counsel failed to file a timely motion to suppress a bed sheet seized in a criminal sexual conduct case because he was unaware the State had the bed sheet.  Counsel had conducted no pretrial discovery because he mistakenly believed the State was required to turned over all its inculpatory evidence to the defense.  *Id.* at 385.  Defense counsel's failure "betray[ed] a starling ignorance of the law" which violated counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* (quotation omitted).

30

In *Hinton v. Alabama*, 571 U.S. 263 (2014), the United States Supreme Court again addressed an attorney's misunderstanding of the law. Hinton's lawyer mistakenly believed he was limited by state law to spending only $1,000 on an expert witness. *Id.* at 273. In fact, more than a year before Hinton's arrest, the $1,000 cap had been abolished and replaced with a provision allowing reimbursement of "expenses reasonably incurred." *Id.* Hinton's attorney recognized that the expert he had retained was not a good one but believed he was "stuck" with the expert because he could not find a better expert willing to work for $1,000. *Id.* The Supreme Court held that counsel's ignorance of the law on this point and counsel's failure "to perform basic research on the point is a quintessential example of unreasonable performance under *Strickland*." *Id.* at 274.

In *Hewitt-El*, 53 F.4th 969 (6th Cir. 2022), the Sixth Circuit found defense counsel's performance "objectively unreasonable" because he failed to move to suppress Hewitt-El's five prior armed-robbery convictions in a trial for armed robbery. *Id.* Counsel mistakenly believed that, because Hewitt-El was charged with being a felon in possession of a firearm in addition to armed robbery, the nature of the prior convictions was admissible. *Id.* The Sixth Circuit held that a competent defense attorney would have known that, under state law, "Hewitt-El could have excluded, as unfairly prejudicial, evidence that he had multiple felony convictions

for the very same offense for which he was on trial." *Id.* Counsel performed

deficiently because his decision "resulted simply from a mistake of law." *Id.*

The Sixth Circuit has held that the "[f]ailure to impeach the credibility of key

witnesses with known false testimony is an egregious error in a criminal case."[6]

*Peoples v. Lafler*, 734 F.3d 503, 513 (6th Cir. 2013). In *Peoples*, Jesse Peoples was

convicted of first-degree murder for the shooting death of Shannon Clark, a drug

dealer. Three months after Clark was shot outside his home, police arrested Peoples,

Demetrious Powell, and Cornelious Harris after the men led them on a chase in a

stolen Jaguar, which ended when the Jaguar crashed. *Id.* at 507. A police officer

who witnessed the crash stated in a police report that Harris was the driver of the

Jaguar. *Id.* Harris was convicted of fleeing in the third degree, which requires

"being the driver," and unlawfully driving away in a motor vehicle. *Id.* The gun

used to kill Clark was found on the driver's side floorboard of the Jaguar.

At trial, Harris and Powell testified to "two key facts: 1) that Peoples was the

driver of the stolen Jaguar and had thus been sitting closest to the murder weapon,

which Peoples owned; and 2) that Peoples told them about how he killed Clark." *Id.*

---

[6] While circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), Sixth Circuit precedents are instructive in determining whether a state court decision reasonably applied existing Supreme Court case law. *Stermer v. Warren*, 959 F.3d 704, 727 nn.3, 4 (6th Cir. 2020) (holding that a circuit court decision evaluating a habeas corpus petition under AEDPA may be cited where the decision provides a "helpful discussion of Supreme Court precedent") (citing *Wiggins v. Smith*, 539 U.S. 510, 522 (2003)).

at 507.  The testimony that Peoples was the driver of the vehicle was known to be false based on the police report.  Inexplicably, defense counsel did *nothing* to impeach the witnesses on this fact which "would have done more than undermine the theory that Peoples sat closest to the gun.  It would have shown that Harris and Powell told at least one lie—the same lie." *Id.* at 513.  The Sixth Circuit concluded:

> Impeachment would have undermined the totality of Harris and Powell's testimony. It also would have provided solid evidence that Harris and Powell had coordinated their stories, because both of them gave the same false testimony. We can think of no better way to attack the credibility of these witnesses than by proving that they testified to the same lie. Without credible testimony from these men, the only thing connecting Peoples to the crime would have been the circumstantial evidence of the murder weapon found in a car with him and two other men. Impeachment certainly could have led to exoneration.

*Peoples*, 734 F.3d at 515.

The Sixth Circuit has also held trial counsel ineffective for failing to impeach a key witness on testimonial inconsistencies. *Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006). In *Higgins*, Wayne Young, a witness in a murder trial, testified inconsistently in his initial statements to police and at preliminary examination. *Id*. at 626-28.  Trial counsel was unprepared for trial and failed to conduct cross-examination of Young.  *Id*. at 628.  The Sixth Circuit noted that as the only eyewitness to the murder testifying at trial, Young "was the *key* to the State's case; yet [trial counsel], who had the weapons to discredit [the witness], allowed [the witness's] testimony to go unchallenged." *Id.* at 634 (emphasis in original).  The

Sixth Circuit stressed that Young was not just a key witness implicating the defendant, he was also "a suspect whose interest in avoiding criminal culpability was tied firmly to convincing the police and the jury that [defendant] – and not Young himself – shot [the victim.]" *Id.* at 633 (citation omitted).

Here, there is no basis in the record to conclude that defense counsel made a *sound* strategic decision not to use Carter's prior statements to impeach his hearsay testimony.  The Court need look no further than defense counsel's argument on the record.  He plainly states (incorrectly) that the rules of evidence did not allow him to impeach Carter's hearsay testimony because Carter did not testify.

Respondent asks the Court to conclude that counsel's failure to acknowledge Rule 806 was an intentional strategy rather than a misunderstanding of the rule.[7] Respondent reasons that counsel's "argument that he could not impeach Carter was not because he did not understand Mich. R. of Evid. 806, but was a full press effort to convince the trial court that allowing Williams to testify was error." (ECF No. 6, PageID.702.)  Respondent further argues that counsel knew that if the trial court allowed Williams to testify about Carter's statements "the battle was lost" and "[i]mpeaching Carter's statements would not have been helpful."  (*Id.*)

---

[7] During the recent hearing in this Court, Respondent conceded that this argument, advanced by predecessor counsel, was dubious.  Nevertheless, the Court addresses the argument because Respondent has not expressly abandoned it.

This argument is unconvincing.  First, it asks the Court to ascribe a motivation directly contrary to counsel's unambiguous argument: "I'll never be able to impeach Mr. Carter on this issue not ever."  (ECF No. 7-14, PageID.1573-74.)  Second, Respondent's argument implies a potential violation of Michigan Rules of Professional Conduct.  Rule 3.3(a)(1), entitled "Candor Toward the Tribunal," provides that "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  Mich. R. Prof. Conduct 3.3(a)(1).  The Court sees no evidence in the record to support Respondent's argument that counsel knowingly misrepresented the admissibility of Carter's police statements under the Michigan Rules of Evidence.  In the absence of any evidence that counsel intentionally misled the court, this Court will not presume he did so based only on Respondent's conjecture.

Moreover, even assuming defense counsel employed the ill-conceived strategy offered by Respondent, once that strategy failed, counsel had every reason to impeach Carter.  The failure to do so was not tactical; it was deficient performance and the state court's determination to the contrary was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

b.  Prejudice Prong

Jones has shown that counsel's performance was deficient and that the state court's contrary conclusion was unreasonable.  The Court turns to the prejudice prong.  Because the state trial court did not decide the prejudice prong, this Court's review is *de novo*.  *Rayner*, 685 F.3d at 638.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (analyzing *Strickland*'s second prong without deferring to the state court's decision because the state court's resolution of *Strickland*'s first prong involved an unreasonable application of law).  Under this *de novo* standard of review and as Respondent has conceded, the Court may consider the jail call evidence.[8]

To satisfy *Strickland*'s second prong, Jones must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

_____

[8] "If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. Under *Pinholster*, a federal court may not "admit[] new evidence upon which to assess the reasonableness of a state court's constitutional analysis." *Id.* at 647. But "[o]nce a petitioner 'clear[s] AEDPA's procedural hurdles' of § 2254(d) on the state court record," a district court may consider evidence not before the state court. *Upshaw v. Stephenson*, 97 F.4th 365, 372 (6th Cir.), cert. denied, 145 S. Ct. 175 (2024) (quoting *Brumfield v. Cain*, 576 U.S. 305, 324 (2015)). Where admission of new evidence "serves 'as a remedy for a federal-law error that had already been found by [a reviewing court] on the basis of the record that was before the state courts, *Pinholster* does not bar consideration of the evidence introduced for the first time in the district court.'" *Upshaw*, 97 F.4th at 372 (quoting *Harris v. Haeberlin*, 752 F.3d 1054, 1058 (6th Cir. 2014)).

The impact of defense counsel's errors must be considered in the context of the totality of the evidence presented.  *See, e.g., Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").   The prosecution's case depended on the credibility of Harris, Carter, and Williams – the three witnesses who tied Jones to the crime.   Defense counsel's failure to use available evidence to impeach these witnesses was a critical missed opportunity – one that could have dramatically reshaped the trial.   In a case like this one, where the case against Jones depended on the credibility of three witnesses, the Court "cannot over-emphasize the importance of impeachment." *Peoples v. Lafler*, 734 F.3d 503, 513 (6th Cir. 2013).

Respondent argues that impeaching Carter with his prior statements would not have assisted the defense because in each statement Carter implicated Jones as either a principal or an aider and abettor.  This argument is unpersuasive for two reasons.  First, the Court does not agree with Respondent's position that Carter's first statement shows that Jones "encourage[d] someone to commit a robbery" and "act[ed] as a reinforcement."  (ECF No. 20, PageID.3967.).  Carter stated that he and Jones were "playin around" and told Harris he should "go and get" the money Pentecost owed him.  (ECF No. 2-1, PageID.83.)  Carter stated that Harris went inside the house before approaching the car and retrieved a ski mask which he wore

as a skull cap. (*Id.*) So, Harris did not, as Respondent argues, "don a disguise." (ECF No. 20, PageID.3967.) And, while Carter and Jones followed Harris to the vehicle, they remained far enough away that Carter could not hear what Harris said, and Carter did not know Harris had a gun until Harris was at the car. Carter and Jones immediately fled when shots were fired. Carter's first statement, therefore, does not show that Jones encouraged Harris to commit a robbery or acted as a reinforcement.

Second, Carter's statements would not have been offered for the truth of their content. Instead, counsel could have used the statements to expose Carter's unreliability as a witness. Carter's shifting narratives—culminating in a fourth statement that conveniently and completely exonerated him—would have underscored a calculated effort to contrive multiple versions of events before settling on one that absolved him of any wrongdoing.

Carter's story changed substantially over the course of his four statements. Initially, Carter identified Harris as the person solely responsible for Pentecost's death and explained that he and Jones did not anticipate that Harris would shoot Pentecost and did not know that Harris had a gun. Carter's statements continued to evolve until his final statement, which painted him as a victim of Jones's threats.

Carter's testimony would have been further impeached had counsel used the jail calls. The jail calls between Carter and Williams show Carter trying to devise a

38

plan to secure his release from jail and Williams admitting to disposing of the gun

("stick"):

> Carter:   Dude, I been thinking ...  I might, I might, I might have a way. You know, to, uh, ... get me outta this shit,... Ima have my lawyer holla at you when he comes to visit me.  ... [H]e gonna tell you what's the plan, dog.  'Cause I can't really say it over the phone.  You know they be recording messages and shit. ...They might try and use some bullshit against me or something so.  Ima have my lawyer holla at you.  So, when [he] holla at you bro, just – just be ready to do what you gotta do.

> Williams:  Like, as far as ...? ... Say as much as you can, without saying much.

> Carter:  You know somebody and they had you do something for them far as ... You know. ... You know, you know what I had, uh, you know what n****s had you do, dog.

> Williams:  Right.

> ***

> Williams:  [T]he stick unattainable.

> Carter:  Huh?

> Williams:   The stick unattainable.

> Carter:  ... [Y]ou don't got to obtain it.  Long as you, ... you know what he told you to do with it. ...My lawyer, my lawyer's gonna break it down to you, dog. 'Cause ... they be saying they listening to the conversations and they be trying to, you know, take what you said on the phone and try to – make something else up ....

(ECF No. 2-1, PageID.597-598, 600-601.)

Carter also identified Harris as the shooter.  He said that police mistakenly

never considered Harris a suspect just because he stayed at the scene and was

39

ostensibly trying to help Pentecost.  But Carter doubted that Harris did anything to assist Pentecost, "cause he the [one] that did it."  (*Id.* at PageID.602.)

Counsel also could have severely undermined Williams's credibility through Carter's custodial statements and the jail calls.  On cross-examination, Williams denied that Carter's story changed over time:

> <u>Defense counsel</u>:  Did Robert [Carter] ever tell you any different account or version of this other than what you told us today?
>
> <u>Williams</u>:    Of what story, sir?
>
> <u>Defense counsel</u>:   Of the whole robbery and the fact that Robert was forced to do it?
>
> <u>Williams</u>:    No, sir.
>
> <u>Defense counsel</u>: So Robert never mentioned about a third person that was out there?
>
> <u>Williams</u>:    No, sir.  The conversation we were having over the phone was him and Drakile.
>
> <u>Defense counsel</u>:  So he was in custody when he's telling you these stories?
>
> <u>Williams</u>:  He told me this over the phone, yes, sir.
>
> Excuse me if I correct myself please.
>
> When he first told me what happened it was him and Drakile. There was no other person.
>
> <u>Defense Counsel</u>:  What about when he was in jail?
>
> <u>Williams</u>:  No.

40

<u>Defense counsel</u>: Always been just this one story?

<u>Williams</u>:  It's only been them two.  There was no other person.

<u>Defense counsel</u>:   So Robert never gives any different versions to you that you're aware of?

<u>Williams</u>:  I never heard any different versions of the story.

(ECF No. 2-1, PageID.345-346.)

Williams clearly committed perjury.  The jail calls are unambiguous on this point—Carter told Williams multiple different versions of the story.

Williams's testimony about disposing of the murder weapon is also demonstrably false.  Defense counsel asked whether police offered him immunity if he told them what happened to the guns.  Williams acknowledged that police offered him immunity but testified that he did not need immunity because he had done nothing wrong.  But during the jail calls Williams told an entirely different story.  Williams told Carter he had made the gun "unattainable" but balked when Carter said he would tell police that Williams had sold the gun.  (*Id.* at PageID.600-01.)  Williams said:

> It's too much.  ... You ain't gonna put me on like that ... [Y]ou tell them ... something else happened with the gun. You, you don't know where that gun went to, because I'm supposed to be the one giving ... Helping you out with the statement, and they going to be questioning me and all this other shit.  That's too much.

(*Id.* at PageID.610.)

41

This is corroborated by Carter's fourth statement that he "gave the gun to sell to Taevian [Williams].  He gave me a portion of the money from the gun [sale]." (ECF No. 2-1, PageID.97.)

Respondent argues that, even if Carter's statements and the jail calls would have been useful to impeach Carter and Williams, "they did not affect the quality of the other evidence implicating Jones."  (ECF No. 20, PageID.3968.)  Respondent argues that "substantial other evidence" – the testimony of Justin Harris and Anthony Cox-Rodgers, and cell phone data – supported Jones's convictions.

The Court first considers Harris's testimony.  The impeachment evidence would have significantly altered the assessment of Harris's testimony, reframing the narrative from that of an innocent witness to that of a likely participant, if not the actual triggerman.

Harris's testimony incriminated both Jones and Carter – he placed Jones and Carter near the crime scene close in time to the 911 call, placed a gun in Carter's pocket, and stated that Jones warned him to deny seeing Jones that night.  The jury heard that Harris was a concerned neighbor who called 911, then held a towel to the victim's head until police and paramedics arrived.  They did not know that, before identifying Jones as the shooter, Carter identified Harris as the shooter in two separate police statements and in the third identified him as either being the shooter or an aider and abettor.  They also did not know that during the jail calls Carter again

42

identified Harris as the shooter.  This evidence impacts the assessment of Harris's potential motive for lying and his overall credibility.

Considering this impeachment evidence, a jury may also have viewed many of Harris's actions after the shooting with suspicion.  For instance, Harris pocketed the phone that was near Pentecost's body when police arrived.  If, as he claimed after questioned by police, he believed the phone was Pentecost's, wouldn't he have handed it to police officers?  He also did not tell police that Jones and Carter had been in his house just moments before the shooting.  In fact, he waited eight days before mentioning Carter or Jones to police.  Harris called 911 at 12:30 a.m.  He called Jones at 12:47 a.m., 12:48 a.m., and 2:24 a.m.  Police knew this because they seized Jones's phone, but, despite Harris's presence at the scene, police did not seize his phone.

The second witness cited by Respondent, Anthony Cox-Rogers, was at Harris's house the night of the shooting.  He testified at the preliminary examination but did not appear for trial.  Cox-Rogers was in Ohio at the time of trial but agreed to return to Michigan to testify. However, at some point after trial began, Cox-Rogers stopped answering phone calls from the prosecutor and officer-in-charge. The prosecutor obtained a witness detainer, and the case was turned over to the Detroit Fugitive Apprehension Team.   The court held that Cox-Rogers was

43

unavailable under Mich. R. 804(a) and allowed his preliminary examination testimony to be read into the record.

Cox-Rogers was at Harris's home on the night of January 26, and identified Jones and Robert Carter as the two men who visited that night. Cox-Rogers estimated that the men stayed about fifteen to twenty minutes. He heard gunshots less than five minutes after Carter and Jones left. He looked out the window and saw Pentecost lying on the ground, then saw Pentecost's car pulling away, followed by a van. At most, he places Carter and Jones near the scene within five minutes of the shooting and shows that "a van" left the scene after shots were fired.

Lastly, Respondent cites cell phone mapping evidence. Detroit police sergeant Michael McGinnis testified as an expert in cell phone analysis and mapping. He obtained the records for Carter's and Jones' phones. Notably, police did not obtain Harris's cell phone records. McGinnis testified that cell phone data placed Jones in the vicinity of the shooting and, later, the burned-out car. But McGinnis also testified that he could discern the vicinity of a phone's location but could not tell the phone's exact location. A cell phone communicates with the cell phone tower with the strongest signal. The strongest signal usually comes for the closest tower, but not always. McGinnis's testimony also showed that there were several calls between Jones's and Harris's phones after the shooting – four calls from Jones to Harris at 12:30 a.m., 12:34 a.m., 12:43 a.m., and 1:01 a.m., and two calls

from Harris to Jones at 12:47 a.m., and 12:48 a.m.  This evidence calls into question Harris's testimony that Jones called him once after the shooting to tell him, "You haven't heard anything.  You haven't seen anything.  You haven't talked to me." (ECF No. 7-12, PageID.1226.)  If Harris had received such a threat, it is unlikely the calls would have continued between the two men throughout the night.

The importance of Carter's, Williams's and Harris's testimony is magnified by the absence of *any* physical evidence linking Jones to the shooting.  There was no DNA evidence, no fingerprints, no gunpowder residue, and no murder weapon. Indeed, the only physical evidence presented incriminated Carter and Harris: Pentecost's jacket was found inside Carter's home.  Additionally, Carter admitted that he had stolen two guns from his uncle, either of which could have discharged the bullets which killed Pentecost.  Finally, the reason the murder weapon was unattainable was because the same two individuals who conspired to testify against Jones also conspired to make the "stick" unattainable.

The evidence counsel did not utilize—Carter's prior inconsistent statements and the jail calls—would have undermined the credibility of the three key prosecution witnesses.

The jail calls counsel failed to review contained far more than statements that could have been used to cross examine Williams.  The conversations could have been used not only to impeach both men, but also to reveal how their joint narrative

evolved over time.  Carter gave his third statement on February 3, 2016, and his fourth statement three months later, on May 24, 2016.  Carter and Williams spoke by telephone five times over that three-month period.  The calls reflect the development of their narrative over time as Carter, in the second-to-last recorded call, told Williams that he had devised a plan to get himself out of trouble:

> Dude, I been thinking ... I might have a way.  You know, to ... get me up outta this shit ... Ima have my lawyer holla at you when he comes visit me. ... [He] gonna tell you what's the plan ... 'Cause I can't really say it over the phone.  You know they be recording messages ...

(ECF No. 2-1, PageID.597.)

Co-defendant Carter did not testify at Jones's trial, but he essentially testified through Taevion Williams.  Carter's story placed the blame entirely on Jones.  Carter claimed he only participated to the extent he did because Jones threatened him with a gun.  Williams testified that he did not participate in any way.  He did not see Carter with a gun that night, much less dispose of one.  This collective testimony from Williams and Carter went essentially unchallenged because defense counsel failed to impeach key prosecution witnesses whose testimony was crucial to the prosecution's case.  If the jury had heard the many conflicting stories, and the apparent attempt to coordinate testimony between Carter and Williams, there is a reasonable likelihood that this impeachment evidence would have created a reasonable doubt as to Jones's guilt.  Jones has shown both that the Michigan Court

of Appeals' decision that counsel was not deficient was an unreasonable application of Supreme Court precedent, and that counsel's performance prejudiced the defense.

### D.  Ineffective Assistance of Appellate Counsel

Having assessed the strength of Jones's ineffective assistance of trial counsel claim, the Court returns to the question of whether appellate counsel was ineffective for failing to raise this claim on appeal.

### 1.  Performance Prong

Under *Strickland's* first prong, the Court must assess whether "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.  The Sixth Circuit has identified "'some considerations that ought to be taken into account'" to determine whether an appellate attorney rendered competent assistance.  *Chase v. MaCauley*, 971 F.3d 582, 592 (6th Cir. 2020) (quoting *Mapes v. Coyle*, 171 F.3d 408, 427 (1999)).  The list, while not exhaustive, offers the following inquiries:

(1) Were the omitted issues "significant and obvious"?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

47

(7) What was appellate counsel's level of experience and expertise?

 (8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Chase v. MaCauley*, 971 F.3d 582, 592-93 (6th Cir. 2020) (citing *Mapes*, 171 F.3d at 427-28).

Many of these factors are relevant to this petition and support the conclusion that Jones's appellate counsel provided ineffective representation.  The omitted ineffective assistance of counsel claim was both significant and obvious.  Even a somewhat cursory review of the trial court record would reveal that the prosecution's case lacked any physical evidence implicating Jones and, instead, relied almost entirely on the testimony of Carter, Harris, and Williams.  With that framework in mind, it would have been obvious to competent appellate counsel that defense counsel failed to use Carter's prior inconsistent statements or the jail calls to impeach these witnesses.  It also would have been obvious that counsel's failure was based on fundamental errors—a misunderstanding of the Rules of Evidence and a failure to prepare for trial.  The errors were plainly evident because trial counsel stated his

mistake of law on the record and his failure to review the jail call recordings that were in his possession.

Second, there is no contrary authority holding that defense counsel renders competent assistance by making a mistake or law or by failing to review the facts and available evidence. And, while no evidentiary hearing was held in state court, appellate counsel clearly failed to apprehend the depth and seriousness of defense counsel's errors. In fact, it appears that appellate counsel also may not have understood that trial counsel could have impeached Carter with his prior inconsistent statements even though Carter did not testify. Appellate counsel fails to mention defense counsel's error in his brief and surely would have had he recognized it.

The ineffective assistance of trial counsel claim was stronger than the claim appellate counsel chose to raise. Counsel raised a single claim before the Michigan Court of Appeals: the trial court erred in allowing highly prejudicial and unreliable hearsay of a non-testifying co-defendant violating Jones's right to due process and confrontation. Appellate counsel's presentation of the Confrontation Clause claim was destined to fail. Counsel did not argue that Carter's statement was testimonial. Non-testimonial statements do not implicate the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Much of counsel's remaining appellate argument focused on the reliability of Carter's hearsay testimony. The Michigan Court of Appeals dispensed with the reliability question finding counsel's arguments

"irrelevant to the admissibility of Carter's statements" because "reliability of the statement is established if the statement satisfied MRE 804(b)(3)." *Jones*, 2018 WL 987394, at *5.

Clearly, the single claim counsel raised on appeal was not particularly strong. Appellate counsel's decision to omit this claim was seriously flawed and fell outside the wide range of professionally competent assistance.

### 2. Prejudice Prong

The Court now turns to the question of prejudice, whether there existed a "reasonable probability" that the outcome of Jones's direct appeal would have been different. *Chase*, 971 F.3d at 595.  There is a reasonable probability that the court of appeals would have found that defense counsel's failure to impeach these witnesses "undermined confidence in the verdict," and that Jones was prejudiced by counsel's failure to raise the issue. *Hewitt-El*, 53 F.4th at 979.

Appellate counsel's ineffectiveness establishes cause and prejudice to excuse the procedural default of the ineffective assistance of counsel claim.  As such, the Court may grant habeas corpus relief on the ineffective assistance of trial counsel claim as discussed above.

### E. Confrontation Clause Claim

In his second claim, Jones argues that admission of Carter's prior statement through Williams violated the Confrontation Clause because it was testimonial in

nature.  A statement is testimonial if it has a "primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

Jones argued:

> Because Carter's fourth statement was testimonial, and Williams' trial testimony merely relayed the substance of the fourth statement to police, Williams' testimony had the primary purpose of "creating an out-of-court substitute" for Carter's testimony.

(ECF No. 2, PageID.50.)

Jones's argument is compelling, but, as counsel has acknowledged,[9] no clearly established Supreme Court precedent establishes that under these circumstances Carter's statement was testimonial.  If the Court were deciding this claim on direct review and not through the prism of AEDPA's strict standard of review, the Court might be persuaded by this argument.  But the Court is constrained by AEDPA's standard of review and denies this claim.

## VI.  Conclusion

The Court concludes that Petitioner was denied his right to the effective assistance of trial and appellate counsel, which prejudiced him both at trial and on appeal.  The state court's decision to the contrary was an unreasonable application of clearly established Supreme Court precedent.

---

[9] *See* ECF No. 21, PageID.20-21 (counsel for Jones recognized that "no clearly established federal law" made this out-of-court statement testimonial).

51

Accordingly, the Court GRANTS a conditional writ of habeas corpus.  The State must either release Jones or institute proceedings to retry him within 120 days of the filing date of this Order.  If the State fails to do so, Jones may move for an unconditional writ seeking immediate release from custody.

IT IS SO ORDERED.


Dated: July 2, 2025                                      s/Robert J. White_____
                                                        Robert J. White
                                                        United States District Judge